# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-696


**STATE OF LOUISIANA**

**VERSUS**

**HARRISON BUCKNER DOYLE**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 3019-20
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


## CHARLES G. FITZGERALD
## JUDGE

**\*\*\*\*\*\*\*\*\*\***


Court composed of Shannon J. Gremillion, Charles G. Fitzgerald, and Gary J. Ortego, Judges.


**CONVICTIONS AND SENTENCES AFFIRMED.**

Sherry Watters
Louisiana Appellate Project
Post Office Box 58769
New Orleans, Louisiana 70158-8769
(504) 723-0284
Counsel for Defendant/Appellant:
    Harrison Buckner Doyle

Liz Murrill
Louisiana Attorney General
J. Bryant Clark, Jr.
J. Taylor Gray
Louisiana Department of Justice
Post Office Box 94005
Baton Rouge, Louisiana 70804-4005
(225) 326-6200
Counsel for Appellee:
    State of Louisiana

**FITZGERALD, Judge.**

Defendant, Harrison Bucker Doyle, appeals his convictions and sentences for crimes against nature.

In February 2020, Defendant was charged by indictment with three counts of aggravated crime against nature in violation of La.R.S. 14:89.1(A)(2)(b)(i). Oversimplifying slightly, Defendant was accused of perpetrating three sex offenses upon his niece Z.D., who was a minor at the time of the alleged offenses.[1]

On April 21, 2023, a six-person jury unanimously found Defendant guilty on counts one and two. As to count three, the jury found Defendant guilty of the responsive verdict of attempted aggravated crime against nature. Defendant, in turn, filed a motion for new trial, which was denied by the trial court.

Thereafter, on July 26, 2023, the trial court sentenced Defendant to twelve years at hard labor on each count of aggravated crime against nature and to six years at hard labor for attempted aggravated crime against nature. The sentences were ordered to be served concurrently. Defendant filed a motion to reconsider sentence, which was also denied by the trial court. Defendant appealed.

On appeal, Defendant asserts four assignments of error. First, Defendant asserts that the State failed to prove the alleged offenses beyond a reasonable doubt. Second, Defendant asserts that he was denied due process of law when he was tried by a six-person jury. Third, Defendant asserts that the trial court violated his Fifth Amendment rights. And fourth, Defendant asserts that his sentences are constitutionally excessive.

---

[1] The victim's initials are used in this opinion in accordance with La.R.S. 46:1844(W).

# LAW AND ANALYSIS

## I. Errors Patent

All criminal appeals are initially reviewed for errors patent on the face of the record under La.Code Crim.P. art. 920. Here, we find one error patent.

Although the court minutes state that the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8, the sentencing transcript does not reflect that this was done. This conflict is to be resolved in favor of the transcript. *State v. Wommack*, 00-137 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62.

Accordingly, within thirty days from this disposition, the trial court shall comply with La.Code Crim.P. art. 930.8 by sending Defendant written notice of the prescriptive period for filing post-conviction relief and by filing written proof in the record that Defendant received this notice. *See State v. Viltz*, 18-184 (La.App. 3 Cir. 11/28/18), 261 So.3d 847.

## II. Defendant's First Assignment of Error

In his first assignment of error, Defendant challenges the sufficiency of the evidence. A sufficiency-of-the-evidence challenge is reviewed on appeal under the standard set forth by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. "This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521. The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

2

A reviewing court must afford great deference to a jury's decision to accept or reject the testimony. *State v. Allen*, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, and 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404 (2004). "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *Id.* at 626.

As pointed out by this court in *State v. F.B.A.*, 07-1526, p. 2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009 (second alteration in original), *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138:

> [T]he testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon*, 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

And as explained by the supreme court in *State v. Dorsey*, 10-216, pp. 43–44 (La. 9/7/11), 74 So.3d 603, 634, *cert. denied*, 566 U.S. 930, 132 S.Ct. 1859 (2012):

> When a witness is impeached, this simply means the jury, as the trier of fact, was presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury was prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.

### A.    *Summary of the Record Evidence*

Detective Sergeant James Jones, of the Calcasieu Parish Sheriff's Office, was the State's first witness. He testified that Z.D. and her father filed a police report in mid-May 2019. Z.D. was fifteen years of age at that time. She initially reported a

3

simple rape. However, Defendant was never charged with that offense. She also informed police about an incident that occurred in Florida.

Detective Sergeant Jones explained that during Z.D.'s Children's Advocacy Center (CAC) interview, she stated that Defendant digitally penetrated her on several occasions, but she could not provide specific dates for the events or give the season in which the events took place. After the interview, Z.D. gave police a bag of unwashed clothing that she had worn on the night of the rape. According to Z.D., the clothing had never been washed, and she kept it because of her obsessive-compulsive disorder. Detective Sergeant Jones recounted that the clothing was subsequently submitted to the crime lab; that the clothing did not contain seminal stains, but there was blood on the panties; and that DNA from blood on the panties was consistent with Z.D., but not Defendant. The detective sergeant also noted that the bed sheets collected by police failed to demonstrate the presence of seminal stains or blood.

Detective Sergeant Jones was then questioned about his interview of James Doyle Sr., who is Defendant's father and Z.D.'s grandfather. James Doyle Sr. is referred to as "Jim." On the other hand, James Doyle Jr. is Z.D.'s father, Jim's son, and Defendant's half-brother. James Doyle Jr. is referred to as "Jamie."

According to Detective Sergeant Jones, Jim stated during his interview that he was unsure if anything sexual had occurred between Defendant and Z.D. Although Jim was confident that nothing had happened at his house, he did note that Z.D. spent the night at Defendant's residence on at least one occasion. Defendant lived in a mother-in-law suite situated approximately seventy-five feet from Jim's home.

4

Yet according to Detective Sergeant Jones, Z.D. reported that an incident had occurred in Jim's home. And during the State's case-in-chief, the detective sergeant was cross-examined about this incident:

Q. She said that after [Defendant] came into the room to "quote" fix her blinds, [Defendant] got in the bed with her, and he fingered her, correct?

A. Yes, sir.

Q. And she told him to stop because her grandfather was in the other room and he might hear, didn't she?

A. Yes, sir.

Q. She didn't say stop because it hurts; did she?

A. That is correct.

Q. She didn't say stop because it's wrong; did she?

A. That is correct.

Q. It's her testimony that she said stop the sexual assault because you might get caught?

A. That is correct, yes, sir.

Q. Now, isn't it true, detective, from being in that house, you were in that bedroom and you noticed it was a short walk to the living room where she claimed Jim was, correct?

. . . .

Q. If this man is sexually assaulting her in that modest size house, all she would have to do is yell or scream and give [sic] Jim Doyle, who was about 15 feet away, would have heard, correct?

A. If she would have screamed, he would have heard her, yes.

Q. If she would have yelled grandpa, he would have heard her?

A. Yes.

Q. And if grandpa would have heard something going on in the room, it would have taken him five seconds to open the door and say, hey, what's going on, correct?

5

A. Maybe a little longer, I believe he was walking with a cane at the time, but, yes, sir, I understand.

Next, Detective Sergeant Jones was cross-examined about an incident that happened in Florida. His testimony ran this way:

Q. Now, jump to this Florida incident. It was a family wedding, correct?

A. I believe so, yes, sir.

Q. A lot of people -- three level condo; do you know that?

A. Yes, sir.

Q. A lot of family members there: Jim Doyle, his girlfriend, [Defendant], his brother, [Z.D.], Chloe -- at least I know all of those were there for sure, correct?

A. Yes, sir.

Q. And [Z.D.] claimed [Defendant] was out on the balcony chilling, correct?

A. Yes, sir.

Q. [Z.D.] claimed she walked out there, correct?

A. Yes, sir.

Q. She claimed my client grabbed her, pulled her pants off, and her panties off right there on the balcony with everybody else inside, correct?

A. Yes, sir.

Q. After he did that, he started fingering her right there on the balcony -- very aggressively, correct?

A. Yes, sir.

Q. And she want's [sic] people to believe that he stopped because the door was open and he could hear people walking around, correct?

A. Yes, sir, that's what she stated.

Next, Detective Sergeant Jones was cross-examined additionally about Z.D.'s behavioral problems and living arrangements:

6

Q. Okay. Now, didn't Jim also tell you, and Jamie told you as, well, about all the problems that Jamie had with [Z.D.] running away?

A. Yes, sir.

Q. All the problems they had with her doing drugs and smoking?

A. Yes, sir.

Q. Skipping school?

A. Yes, sir.

Q. All the problems they had -- at some point, they had to get a coroner[']s inquest to get her committed, correct?

A. Yes, sir.

Q. That's how bad it was?

A. Yes, sir.

Q. All of this before these allegations came out, correct?

A. Yes, sir.

Q. She was a very, very problematic child?

A. Yes, sir.

Q. This is according to her parents, as well as her grandfather?

A. That is correct.

Q. Okay. Now, did you get any information about where [Z.D.] was staying prior to her coming to live with Jim Doyle?

A. I know she -- I think while she was with Jim, she moved up to Beauregard [Parish] for a short stent, but she was staying with Jamie until he couldn't take care of her anymore.

Q. Okay. But give me a time[]frame -- because that's the problem I'm having. When did she go stay in Beauregard, for example, if you know?

A. I don't recall an exact date, it was a very short stent.

Q. She ran away, correct?

A. That is correct.

7

Q. She ran away and she spent the night at Jim Doyle's house – the night she ran away from her grandmother, correct?

A. I don't know if she spent the night, but she was located by the police, but I believe it was around Jim's house.

Q. Okay. She was located by the police at the Lake Charles mall, correct?

A. I'm not sure exactly where she was located.

Q. But she was located by the LCPD, correct?

A. She was located by the police, yes, sir.

Q. Because she had run away from her grandmother[']s [in] Beauregard, correct?

A. That is correct.

Q. And isn't it true she stayed at Jim's house that night, so that they could keep an eye on her, correct?

A. That is correct.

Q. And isn't it true that that night, she stayed in [Defendant's] house so he could keep an eye on her to keep her from running away, correct?

A. That is what was told to me, yes, sir.

Q. And you don't know the approximate date of this, do you?

A. About a month before – before the allegation came out.

Q. So, you're assuming that this night she ran away from her grandmother's is about a month before, because that was the only night she had recently stayed at [Defendant's] house, correct?

A. Yes, sir.

Q. And do you have any other evidence that she had ever spent the night at [Defendant's], other than that month before when she ran away from grandmother[']s.

A. No, sir, that's the only night that was mentioned.

Q. So if there was a rape going on, it would have to be the night she ran away from her grandmother's in Ragley, correct?

A. Yes, sir.

. . . .

Q. If I told you this occurred in October of 2018, would that cause you any concern with your timeline or allegations?

A. That would be -- not fit with the original timeline that was provided, yes, sir.

Q. That would be a little problem, right?

A. It would be within the year[']s time[]frame, but regarding how we had started this conversation, regarding what rape, how we define rape, yes, that would be a problem.

Q. It would be a problem regarding her credibility and when she claims she was raped, too, right?

A. I would not say her credibility, no, sir.

Q. Okay. But you agree, it would be different from what she told you?

A. Yes, sir.

Q. Okay. And you agree it fits within your timeline, but it would be fundamentally different from the timeline when she claims she was raped, correct?

A. It would be a different date than that one month, yes, sir.

Then, on redirect, Detective Sergeant Jones was questioned about the following conversation he had with Jim:

Q. Okay. Do you remember the part where [Jim] mentioned [Z.D.] being kicked out because she had run away?

A. Yes, ma'am.

Q. Okay. Where did she say he went -- where did he say she went?

A. To her grandmother's house in Ragley, in Beauregard Parish.

Q. Do you remember if she stayed there?

A. That's where she was moving into . . . .

Q. Okay. And was she -- and did she ultimately end up somewhere else?

9

A.  Yes, ma'am.

Q.  Where was that?

A.  That was going to be in Lake Charles.

Q.  Okay.  And do you remember how that came to be?

A.  I know she ran away from the grandmother's house in Ragley.

Q.  Okay.  And what did Mr. Doyle say they did with [Z.D.] that night?

A.  They had picked her up -- I think at the police department, if I'm not mistaken.

    . . . .

Q .  What did he say about where he thought [Z.D.] slept that night.

A.  Mr. James said he thought [Z.D.] had slept with [Defendant] that night in his house.

According to the detective sergeant, Jim thought Z.D. was "promiscuous by the way she acted, talked and walked and things of that nature -- at that time."  Jim told Detective Sergeant Jones that Z.D. would lie and that she was a troubled child. Additionally, Jim referred to Defendant as the "keeper of secrets" regarding his relationship with Z.D.

Detective Sergeant Jones then reiterated that Z.D. had reported Defendant digitally penetrating her on several occasions and inserting his penis into her vagina on one occasion.  Detective Sergeant Jones recalled that the digital penetration happened at Jim's house, and the penile penetration happened at Defendant's house. Nonetheless, the detective sergeant acknowledged that it was difficult to establish a sequence of events because Z.D. could not provide specific dates.

Z.D.'s father, Jamie, testified next.  Jamie explained that he is the father of twin daughters: Z.D. and Chloe Doyle.  He also explained that Defendant is his half-brother.

According to Jamie, Z.D. lived with her mother, Hope, who is also Jamie's ex-wife, from January to June 2018. However, at Jamie's request, Z.D. moved in with her paternal grandfather, Jim, in mid-June 2018 because of "teenage altercations" with Hope that led to a child-protection-service's investigation. Yet three months later, in September 2018, Z.D. left Jim's house at Jim's request.

At that time, Jamie was in a "sober living environment," so he arranged for Z.D. to move in with her maternal grandmother in Ragley, Louisiana. But two weeks later, in October 2018, Z.D. ran away from her grandmother's home, leaving a note behind saying she was sorry. Shortly thereafter, Z.D. was found by police in a mall in Lake Charles. Jamie, in turn, arranged for Defendant to pick up Z.D. from the Lake Charles Police Department and bring her to Jim's house. However, because Defendant lived on Jim's property, Jamie was unsure which house Z.D. stayed in after she was picked up.

Jamie testified that he subsequently admitted Z.D. into New Beginnings, which is a treatment center in Opelousas for teenagers with addiction and behavioral issues. She stayed there for forty-five days. After she was discharged, she lived with Jamie in Lafayette from November 2018 to March 2019. But in February 2019, Jamie called the police because Z.D. was not attending school. As a result, Z.D. was sent to North Lake Behavioral in Covington where she stayed for five days.

In March 2019, Jim, Jamie, Z.D., Chloe, and Defendant attended a family member's wedding in Florida and stayed together in a three-story condominium. Jamie testified that Z.D. first reported Defendant's abuse after the trip to Florida, sometime in mid-to-late April 2019. Yet Jamie did not report the abuse to police until three or four weeks later.

Nonetheless, according to Jamie, Z.D. went to visit her mother, Hope, soon after returning from Florida. Jamie had asked Jim to pick up Z.D., but Defendant

did so instead. According to Jamie, Defendant brought Z.D. to Jim's house. And the next day, Jim drove Z.D. to Jamie's home in Lafayette.

Jamie recalled that when Z.D. returned to Lafayette, she "was not cognitive"; she was "unresponsive." She was not acting like herself: she was distant and had generic responses when she was usually bubbly. Jamie further explained that Z.D. sat in a chair not moving. She did not bathe or eat. In fact, Jamie recalled that Z.D. was still in the same chair the next morning when he and Chloe woke up. According to Jamie:

> [Z.D.] had her cell phone, and she was trying to wash her cell phone and her clothes were in the crock-pot, because my grandmother had a crock pot, called Pot of Luck from the '60s. And I asked her "why are you closing [sic] the crock-pot, baby[?]"; she said to make them better.

Jamie explained that after three or four days of this, "I said, 'baby, I can't fix -- I don't know what's wrong' and I said, 'you have got to go to the hospital, please.'" Z.D. was subsequently admitted to Oceans Behavioral Hospital in Lake Charles. She was put on medication and eventually released, but Jamie could tell that something was still wrong.

According to Jamie, Z.D. eventually told him that Defendant did "something" to her. Specifically, Jamie recalled that Z.D. wanted to visit Caroline, who was Z.D.'s sponsor at New Beginnings. And during this visit, Z.D. broke down and disclosed that Defendant had raped her. But Jamie did not immediately report this to police. Several weeks went by before he and Z.D. went to the Calcasieu Parish Sheriff's Office to report what had happened.

After that, Jamie explained that Z.D. eventually went to Vermilion Behavioral Health for more help. Jamie then summarized things as follows:

> This has been out in the open for about three years now, and -- (crying) I just want it known that the water issue progressively got worse, even to this day. She constantly washes her hands and her feet, every single day that I've been at that house -- this is a content [sic] thing. She's

12

constantly washing and looking her -- and looking at 8's, because on our side of the family, our birthdays all have 8's in it, and that's good luck, so she constantly has a repetition that she does every day before she goes to bed. She'll look at an 8 or anything with 8's on it. The clock or the microwave, but the water issue has been going on every day since I became aware of this for three years. (Crying.)

During cross-examination, Jamie testified that he did not promptly report the matter to police immediately because he did not "know if [he] was even in [his] right state of mind to do much of anything at that point."

The State's next witness was Faith Benton. Ms. Benton was formerly employed at the CAC, and she interviewed Z.D. on May 21, 2019. This interview was admitted into evidence in conjunction with Ms. Benton's testimony. Z.D. was fifteen years old at the time of the interview.

During the CAC interview, Z.D. told Faith that she was there to talk about the rape. Z.D. stated that she was at Defendant's house and that he "started going on top of me, and I froze up, and he raped me." Z.D. stated that Defendant (her uncle) told her he liked it because it was wrong. She further said that, at the time she lived with her grandfather, Defendant got in her bed and "fingered" her "like ten" times, which meant his fingers were in her vagina, when she did not want him to. She specifically described one instance where she was dreaming it was happening, and when she awoke, Defendant was in her bed touching her sexually. She also recalled a time when she told Defendant to stop because her grandfather was in the next room. According to Z.D., all this began in the summer of 2018.

During the CAC interview, Z.D. discussed the trip to Florida to attend a family wedding. She described how she did not know Defendant was sitting in a beach chair on the balcony of their condominium, so she went outside. And while outside, Defendant took off her pants and underwear and "fingered" her. She described

13

Defendant as aggressive, and she noted that he stopped when he heard people coming. Z.D. said she was too scared to tell anyone.

On another occasion, Z.D. ran away from her maternal grandmother's home in Ragley, Louisiana, so she had to stay with Defendant for one night. She was in bed, and Defendant came in and took off her shirt. He touched her breasts and said he was sorry for doing it because it was wrong, but he had to do it. Defendant then raped her, and he made her touch his penis and masturbate him. Defendant's hand was on hers, and he was controlling her actions. Defendant got mad because she was not doing it correctly. Defendant rubbed her "area" very hard. Her clothes were on the floor. Defendant masturbated himself before he raped her. She told him to stop once, but he did not. Z.D. said she was frozen. Z.D. explained that rape meant taking advantage of someone when they do not want it. She then said Defendant put his penis in her vagina. He stopped when he ejaculated on her stomach. She thought some of the ejaculate got on her shirt, so she did not wash it. In fact, she brought the clothes she wore with her to the interview. Z.D. told Benton that at some point, Defendant told her not to tell anyone.

While on cross-examination, Ms. Benton did not recall Z.D. saying Defendant forced her to "'go down on him.'" Ms. Benton acknowledged that Z.D. never said Defendant choked her. Ms. Benton further acknowledged that Z.D. said Defendant "fingered" her approximately ten times, which meant his fingers were inside her vagina.

According to Ms. Benton, Z.D. said Defendant entered her room because she asked him to fix the blinds. Thereafter, he slept on her floor and ended up in the bed "fingering" her. When discussing the events that occurred in Florida, Z.D. said Defendant heard someone and stopped, and the door to the balcony was open. During the interview, Z.D. did not recall the date of the rape but said it probably

14

occurred a month prior to the interview. Ms. Benton acknowledged that Z.D. said Defendant made her masturbate him then raped her. Furthermore, Z.D. told Defendant to stop one time, but he did not. Z.D. "thought" there was some ejaculate on her shirt because it was wet, so she kept the shirt. Z.D. also mentioned Defendant pulling her hair. According to Ms. Benton, Z.D. said she first told Ms. Joffrion what happened to her. She never indicated she told her sister, Chloe.

Chloe Doyle, who is Z.D.'s identical twin, testified next. Chloe was nineteen years old at the time of trial. But in April 2019, she was fifteen and lived with her father in Lafayette. This is when Z.D. moved back in with them. As Chloe recalled, Z.D. suffered from obsessive-compulsive disorder, but her obsessiveness was extreme at that time:

> She couldn't sit anywhere else but this one recliner that was at our house and she couldn't sit anywhere else other than that chair. She was constantly putting water all over her body, and all the clothes that she had had, that was, like, in Lake Charles, she couldn't touch because we had got [sic] in an argument and I told her to pick up her clothes, and she couldn't even touch the clothes. And then, she couldn't watch anything else but You[T]ube because everything else that she watched was associated with Lake Charles.

According to Chloe, Z.D. told her that something inappropriate had happened, but Chloe didn't tell anyone. As a result of Z.D.'s behavior, she was admitted to Oceans. Chloe recalled visiting Jim's home in Lake Charles shortly thereafter. And during this visit, Chloe asked Defendant if he had any idea why Z.D. was at Oceans. In response, Defendant blamed Z.D.'s issues on her mother. Chloe then asked Defendant if he had had sex with her sister. Chloe testified that Defendant "immediately started crying and told [Chloe] he wanted to kill himself." Chloe then explained:

> A. He had told me how much he wanted to kill himself and that he took a very dark path. And that he was really sorry and he had explained to me the scenario of how it happened a little bit.

15

Q.    And what did he say; let's follow[]up with that.

A.    He had told me that he had put her into a room -- or took her into his room and that he started to penetrate, right, I don't know if that's the right word.

Q.    I need you to tell me what he said?

A.    Oh, he had took [sic] her to the room and that he started to -- he said that he had took [sic] her to the room and he started to have sex with her.  And then he had -- that's what he had told me, that he  started -- he took her -- yeah.

Q.    Okay.  Did you ask him why he did that?

A.    Yeah, I did. I did, and he told me that -- (crying) I'm sorry.  He had told me that incest -- he was attracted to incest because he knew that it was something that he wasn't supposed to be doing -- and that's like the thing's [sic] that he was attracted to.

Q.    Okay. And I think you might have touched on this earlier, but did he express regret to you -- for what he had done?

A.    Yeah, he did.  He did express.

Q.    And how did he express that?

A.    He tell [sic] me how sorry he was and that he took such a dark path and he apologized to me about everything and that he regretted it -- from, like, he told me a lot that he regretted it.

      . . . .

Q.    During this conversation, did he express to you any concern that others might find out?

A.    Yeah, he did.

Q.    All right. I need you to recall and tell me what he said about that.

A.    He told me that if I was to tell anybody that he would kill himself.

In the end, Chloe explained that she did not tell her father about the rape until after Z.D. reported the allegations because she did not want Z.D. to "spiral."

Caroline Joffrion testified next.  Ms. Joffrion explained that she was an early interventionist for the Iberville Parish School System.  She had also been Z.D.'s

16

sponsor at New Beginnings. She did not recall the time frame in which Z.D. disclosed being sexually assaulted, but Ms. Joffrion testified that Z.D. had asked to come to her apartment to tell her a secret. While at Ms. Joffrion's apartment, Z.D. reported that Defendant had penetrated her with his fingers and raped her at some point after the Florida trip.

Ms. Joffrion then testified about Z.D.'s behavior but was unable to provide dates for the occurrences. As Ms. Joffrion recalled:

> I've noticed that we -- when we were to bring up [Defendant's] name . . . , she had to wash her hands continuously and she was not able to wear the same clothes ever again -- if we spoke about what had happened to her. She was not able to leave the house for several, several months she was confined to her house. She has just completely fallen apart; she's devastated.

The State's next witness was Z.D. She initially confirmed that her date of birth was July 14, 2003. She then explained that she was fourteen years old and living with her grandfather Jim in the summer of 2018. According to Z.D., Defendant lived in what was referred to as the mother-in-law house in Jim's backyard.

Z.D. described several sexual acts committed by Defendant. During one event, Defendant entered her room and sat on the bed, ultimately leaning her back and penetrating her with his fingers. Z.D. testified that she told Defendant to stop because her grandfather was in the next room. She said she was looking for a way to make him stop, and she did not "necessarily care" if he got caught.

On another occasion, her blinds fell from the window, and Defendant was called to fix them. Defendant laid down on the floor while she was in bed. At some point, Z.D. fell asleep and dreamed that Defendant was touching her. When she awoke, Defendant was right next to her touching her breasts under her shirt. Defendant then put his hands in her pants, rubbed her vagina, and inserted his fingers

17

in her vagina. Z.D. said she "froze up." She did not tell anyone about this incident because she was afraid, and she and her family had suffered "immense pain and trauma already."

When asked if those were the only two times Defendant touched her, Z.D. stated, "I know that there was a lot more. I don't remember every single time though, but there was a lot more." Z.D. said she tried to block the incidents out.

When questioned about where she lived, Z.D. said she lived with her mother at the beginning of 2018. Z.D. acknowledged leaving her mother's house in June 2018. She then moved in with Jim. But her behavior there was problematic, and he asked her to leave a few months later in September 2018.

Thereafter, Z.D. went to live with her maternal grandmother in Ragley. But she ran away after only two weeks. She made her way to a mall in Lake Charles and subsequently learned that an Amber Alert had issued for her. She was taken to the police station, and Defendant picked her up. She spent the night at Jim's that night.

Z.D. eventually ended up at New Beginnings, where she met Ms. Joffrion. She stayed there for two months. Z.D. was released on Thanksgiving Day in 2018. She then moved in with Jamie and Chloe in Lafayette. She recalled that the family was supposed to go to Jim's for Christmas. So before then, she told Chloe that Defendant was trying to have sex with her. Z.D. lived in Jamie's home until March 2019.

In March of 2019, Z.D. and her family went to a wedding in Florida. She was fifteen at that time. Z.D., Chloe, Jamie, Jim, and Defendant all stayed in one house. According to Z.D., while on the beach, Defendant touched her breasts. On another occasion, Z.D. was on the balcony. Defendant joined her. He then touched her breasts, put his hands in her pants, rubbed her vagina, and put his fingers in her

18

vagina.  She was uncomfortable because the family was there, but Defendant did not care.

After Z.D. returned from Florida, she visited her mother, but Z.D. and her mother had an argument. Jamie could not pick her up and suggested that Defendant or Jim do so.  Z.D. disagreed.  Nonetheless, Defendant ultimately arrived to pick her up.  According to Z.D., Jim did not want her in the main house, so she had to stay with Defendant.  Z.D. described what Defendant did to her that night as follows:

A. He had -- he wanted to see -- he had asked to see my boobs, and he had taken my shirt off and he made very childlike faces, like he had never seen boobs in his life.  He had touch[ed] my breasts, and I don't remember how, but my pants, he had taken my pants off.

. . . .

A. He went to go push my head towards this -- I don't, this is what I remember, I don't remember orderly.

Q. Okay.

A. He had eventually taken his pants off, too, and he went to go push my head towards his penis -- to where I assume, to give him head. I didn't; I kept my mouth shut, and I was very -- I don't know the word -- resistant.  And --

Q. Where was his hand?

A. On my head.

Q. What happened next?

A. He kind of gave up -- because I wasn't gonna -- I didn't open my mouth.  And, he had taken my hand and put it on his penis to jack him off.

Q. Okay.  Did anything else happen?

A. He -- I remember he had pulled my hair, kind of, like, held it from the back of my head.  He had laid me down, and punish [sic] my legs back and ended up putting his penis in my vagina.

Z.D. explained that Defendant ejaculated on her stomach.  She then got out of bed and got dressed.  Z.D. did not say anything to Defendant because she was in a

state of shock and froze. Z.D. also testified that Defendant choked her, stating, "He put his hands around my neck; it wasn't hard enough to kill me or to really leave a mark, but there was some pressure." Defendant told Z.D. not to tell anyone because her father and uncle would "chop his dick off." She tried to scrub semen off the shirt with a wet rag. Z.D. threw the clothes she had on in the closet because she did not want anything to do with the clothes and did not wash them.

Next, Z.D. testified that once she got to her father's house, she was "completely cationic." As she put it:

> I was paralyzed in my brain and my body. I sat in [a] chair, and I couldn't sleep with it. I did not like the feeling of laying down, so I kept the recliner up at all times; I slept with that up at all times. I watched the same thing over, and over and over again. I ate the same thing every single day. I didn't talk to my sister -- barely. I didn't talk to my dad. It was -- I was genuinely stuck in my brain.

Z.D. further testified about her mental state following the rape, explaining as follows:

> A.      Any time that that night was in my head, I wanted so bad to think that it was a dream. I just wanted it -- I wish that -- I was like, I wanted to make myself believe that that didn't happen. And, I suffer with OCD, so I wouldn't even allow myself to cry about the assault or the rape, because anytime that I cried about it, those tears resembled him -- so, I would immediately have to wash my face.
>
> . . . .
>
> A.      There was a crock pot that my dad had bought, that is called a Lucky Pot. Since I suffer with OCD, I thought, in my brain, which I know in reality, it's not true, but it's just an impulse -- if I put my clothes in the Lucky Pot, and then I put my clothes on, that I would be lucky.
>
> . . . .
>
> A.      Everything that, even if I thought about it, thought about him or anything to do with the house, the street, anything, I would immediately have to wash my hands. I would put water on my phone. It didn't matter what it was, if my phone had touched something that reminded me of him, I would have to rinse my phone off . . . . Every single thing that I touched, I would have

20

to wash my hands to the point where my hands were literally peeling off.

Z.D. then recalled that she was admitted to Oceans Behavioral Hospital. While there, she did not disclose what had happened to her: she did not want to suffer another traumatic event and did not want her family torn apart. However, Z.D. eventually told Ms. Joffrion about the abuse and then her father. Next, her father called his AA sponsor, Sheriff Jim Mouton, and then reported the matter to the police. Z.D. subsequently went to Vermilion Behavioral Health to address her obsessive-compulsive behavior.

Z.D. also testified about other sexually abusive encounters with Defendant. She stated that the first time Defendant touched her vagina was the summer of 2018. Additionally, he tripped her several times and touched her breasts. She also mentioned an encounter in the garage to the jury but was unsure if she mentioned much of this information in her CAC interview.

During cross-examination, defense counsel questioned Z.D. about the order of events:

Q. And, you told [Ms. Benton during your CAC interview that] the first time was the time when you called [Defendant] and he allegedly came in to help you fix your blinds, correct?

A. Yes, sir.

Q. But, you told the jury that that was actually the second time, right?

A. I said, I'm not saying it in order, those are the times that I remember.

Q. Oh, okay. But, you remember [the prosecutor] asking you [about the] first time and you --

A. I know that, yeah, that was the first time. Yes, sir.

Q. Which one was a first time?

A. The blinds.

Q. Okay. But, when [the prosecutor] asked you, a few minutes ago -- first time, you told her about another incident, and then, you got to the blind incident the second time. Do you remember that?

A. I guess that that did happen.

Q. So, the blind wasn't actually the first time?

A. Sir, I don't remember it in order.

Q. Okay. So, if [the prosecutor] asked you which is the first time, why didn't you say, well, ma'am, I don't recall any --

A. I'm pretty sure I did.

Q. Okay. So, the blind incident -- you're sleeping in your bed, he took your clothes off without waking you up, correct?

A. It did wake me up eventually, yeah, it did.

Q. Didn't you tell [Ms. Benton that] you woke up, and you didn't have your clothes on and they were on the floor?

A. Yeah.

Q. Okay.

A. But, it did wake me up eventually, yes.

Q. Okay. I'm not asking you eventually, ma'am, work with me. But, when this man, allegedly, took your clothes off, it didn't wake you up, did it?

A. I don't recall.

Q. Okay. Do you recall telling [Ms. Benton], you woke up, your clothes, were off and they were on the floor; do you remember telling her that?

A. I'm not sure if I said that or not.

Z.D. was also questioned about whether Defendant put his hands in her pants during the incident in Florida or whether he took her pants off. In response, Z.D. could not recall which one had happened. Later, Z.D. acknowledged that she did not tell Ms. Benton about Defendant choking her during the CAC interview. Z.D.

22

was then questioned about her failure to provide other information during that interview:

Q.   Okay.  And you told this jury that my client tried to make you go down on him, correct?

A.   Yes, sir.

Q.   Okay.  And, you told this jury you didn't because you kept your mouth closed, correct?

A.   Yes, sir.

Q.   You never told [Ms. Benton] that, did you?

A.   No, sir.

Q.   You told this jury a lot about a crock-pot that you put clothes in, correct?

A.   Yes, sir.

Q.   You mentioned none of that to [Ms. Benton], did you?

A.   No, sir.

Q.   You talked about a water issue you got, I guess it's an aversion to water -- and you wash your hands nonstop and all of that, you remember that?

A.   Yes, sir.

Q.   None of that's mentioned to [Ms. Benton], is it?

A.   Not that I can recall, no.

Q.   Okay.  Don't you think you could recall it if it was mentioned?

A.   It was a long time ago.

Q.   Okay.  But, you did watch it on Monday, right?

A.   Yes, sir.

Q.   Now -- just one minute.  After my client, allegedly, raped you, what did you tell [Ms. Benton] that you did?

       . . . .

A.   I can't remember.

23

Z.D. then acknowledged that she sat outside with Defendant while he smoked a cigarette. She admitted that this was different from what she said during her CAC interview: there, she stated that after the rape, she dressed herself and went to the main house. Z.D. was further questioned about her trial testimony and her CAC interview, specifically about how she ended up at Defendant's house on the night she was raped. Z.D. told the jury that she left her mother's house after an argument. Yet she was not sure if she provided Ms. Benton with this information during her interview.

Throughout her cross-examination, Z.D. openly acknowledged any differences in her CAC interview and trial testimony. But Z.D. did not believe her memory was better at the time of her CAC interview. She explained, "The whole time -- I tried to forget what happened." "I'm reliving everything right now, so, a lot more memories is [sic] coming up."

On redirect, Z.D. testified that when she appeared for her CAC interview, she did not know what to expect and answered the questions to the best of her ability, providing the information she could recall. She was not given any guidance or direction on what she was supposed to share. For instance, she told Ms. Benton she had run away, but not where from. She also indicated that she thought there might be ejaculate on her shirt because there was a wet spot. But she had wiped the shirt with a wet rag and sat in the rain.

Jim testified next. Jim explained that Defendant was his son. He stated he was certain that Z.D. did not spend the night at his home in April 2019 after getting into a fight with her mother. According to Jim, after September 2018, Z.D. only spent the night at his home when her father was there and only once at Defendant's

24

house. Jim clarified that Z.D. moved in with him in June 2018 because his son Jamie had asked if he had room for her.

Jim also testified that Z.D. had behavioral issues and once stole his car. According to Jim, Z.D. admitted letting people into the house through her bedroom window. She also ran away and was returned by the police. In August or September 2018, Z.D. went to live with her grandmother in Ragley. But by October 2018, she had run away. She was then picked up by police at a mall in Lake Charles and spent the night at Defendant's house because Jim could not keep an eye on her. The next day, Jim drove Z.D. to her father, Jamie, in Lafayette, who had arranged for Z.D. to go to New Beginnings. In 2019, Z.D. lived with Jamie. The family went to Florida on March 7, 2019, for a wedding. And as Jim recalled, Z.D. did not report that anything inappropriate had happened during the trip.

### B.    Sufficiency of the Evidence

The offense of "aggravated crime against nature" is defined by La.R.S. 14:89.1, which states in relevant part:

A. Aggravated crime against nature is . . . :

. . . .

(2)(a) The engaging in any prohibited act enumerated in Subparagraph (b) of this Paragraph with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child, grandchild of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece.

(b) The following are prohibited acts under this Paragraph:

(i) Sexual intercourse, sexual battery, second degree sexual battery, carnal knowledge of a juvenile, indecent behavior with juveniles, pornography involving juveniles, molestation of a juvenile or a person with a physical or mental disability, crime against nature, cruelty to juveniles, parent enticing a child into prostitution, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.

25

"Sexual intercourse" is defined as anal, oral, or vaginal sexual intercourse. La.R.S. 14:41; La.R.S. 14:80.1; 14:81.4; and 14:107.5. And "sexual battery" is defined by La.R.S. 14:43.1(A):

> Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, directly or through clothing[.]

Thus, for this court to affirm Defendant's convictions for two counts of aggravated crime against nature, we must determine whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Defendant intentionally engaged in sexual intercourse with Z.D. or intentionally touched Z.D.'s anus or genitals using any instrumentality or any part of his (Defendant's) body. The essential elements pertaining to Z.D.'s age and the relationship between Defendant and Z.D. are not at issue in this appeal.

Yet Defendant was also convicted of attempted aggravated crime against nature. As stated in La.R.S. 14:27, an attempt to commit a crime is a separate but lesser grade of the intended crime. Paragraph (A) of that statute provides:

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

Hence, for this court to affirm Defendant's conviction for attempted aggravated crime against nature, we must determine whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Defendant intended to commit the underlying crime and acted in furtherance thereof.

26

Now to Defendant's arguments. Defendant contends that the evidence was insufficient because Z.D. could not give consistent context as to time, place, or details of the offenses, and she gave different accounts of the offenses to Ms. Benton, Ms. Joffrion, Jamie, Chloe, and the jury. Defendant notes, for example, that during Z.D.'s CAC interview, she failed to report various details to Ms. Benton about what happened on the night of the rape: she failed to report that she fought with her mother, that Defendant asked to see her "boobs" and touched them, that Defendant pushed her head toward his penis, that Defendant choked her, and that Z.D. and Defendant dressed and went out on the porch after the alleged offense.

According to Defendant, the CAC interview is a prior inconsistent statement that is not substantive evidence of his guilt. In support, Defendant points to *State v. Ray*, 259 La. 105, 249 So.2d 540 (1971). There, the defendants complained that the trial court allowed the state to impeach its own witness by introducing a prior inconsistent statement and failed to caution the jury that the prior inconsistent statement was admitted only as to the credibility of the witness and not as substantive evidence of defendants' guilt. The supreme court resolved the issue as follows:

> Since 1897, Louisiana has followed the orthodox rule that when a witness other than the defendant is impeached by the admission of a prior inconsistent statement incriminating the defendant, the statement is admissible only on the issue of credibility and not as substantive evidence of the defendant's guilt.
>
> Louisiana has also adopted a minority rule that the failure to caution the jury as to the limited purpose of the inconsistent statement is error despite defendant's failure to request such an instruction.
>
> A growing minority of courts now admit such prior inconsistent statements as substantive evidence of guilt to be weighed by the jury. Both the Model Code of Evidence (Rule 503) of the American Law Institute and the Uniform Rules of Evidence (Rule 63) have adopted the substantive evidence rule. Several leading authorities on evidence support it. The unrestricted admission of such statements in evidence does no violence to the Confrontation Clause of the United States Constitution.

. . . We have reexamined our jurisprudence in the light of present conditions in criminal justice. We adhere, at least for the present, to the established rule that such prior inconsistent statements are admissible only on the issue of credibility and not as substantive evidence of a defendant's guilt. In compliance with our prior jurisprudence, we must reverse these convictions and order a new trial. *See* LSA-C.Cr.P. Art. 921.

*Id*. at 542–43 (citations omitted).

But in the case before us—unlike *State v. Ray*—the jury was instructed as follows:

The testimony of a witness may be discredited by showing that the witness . . . made a prior statement which contradicts or is inconsistent with his or her present testimony. If you find that a prior inconsistent statement was made, the prior statement may be considered, for the truth of the matter, asserted in the statement, only if you find that there exists additional evidence to corroborate the matter asserted by the prior inconsistent statement.

Importantly, the jury charge here is an accurate statement of current Louisiana evidence law. In *State v. Wilson*, 50,418 (La.App. 2 Cir. 4/6/16), 189 So.3d 513, *writ denied*, 16-793 (La. 4/13/17), 218 So.3d 629, the second circuit explained that prior inconsistent statements generally could not be used as substantive evidence of a defendant's guilt until the 2004 amendment of La.Code Evid. art. 801(D)(1)(a), which provided that a prior inconsistent statement was not hearsay and could be considered for the truth of the matter asserted if the statement was corroborated.[2] *See also State v. Barton*, 20-274 (La.App. 3 Cir. 5/5/21), 319 So.3d 907, *writ denied*,

---

[2] Louisiana Code of Evidence Article 801(D)(1)(a) currently reads as follows:

D. Statements which are not hearsay. A statement is not hearsay if:

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:

(a) In a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness' attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement[.]

28

21-788 (La. 10/12/21), 325 So.3d 1071, *and writ denied*, 21-783 (La. 10/12/21), 325 So.3d 1072.

Defendant also cites *State v. Maise*, 14-1912 (La. 6/30/15), 172 So.3d 639, to suggest that his convictions should be reversed. But there, the supreme court determined that the defendants were entitled to a new trial based on newly discovered evidence relating to the credibility of the victim, who recanted her allegations against the defendants, and that of a corroborating witness. The supreme court observed that the victim offered different versions of her story "at virtually every juncture of the investigation and prosecution of these defendants," and a corroborating witness offered two different versions of her story on successive days of testimony after receiving immunity from the state. *Id.* at 645.

Yet unlike *State v. Maise*, the instant case does not involve newly discovered evidence, and Z.D. has never recanted her allegations against Defendant. Hence, the case at bar is clearly distinguishable.

Next, Defendant challenges Z.D's credibility by contending that her ability to perceive events was impaired due to longstanding behavioral, emotional, and substance abuse problems. Specifically, Defendant points to truancy issues, running away, defiance, and substance use prior to the alleged sex offenses. According to Defendant, Z.D. lived in chaos and lied.

Defendant's final argument points out the absence of forensic evidence despite Z.D.'s claims that Defendant ejaculated on her clothing. Defendant contends that this, too, makes the jury's credibility assessment unreasonable.

To summarize, Defendant here argues that Z.D.'s trial testimony is the only evidence of the charges, that Z.D.'s prior inconsistent statements are not substantive evidence of guilt, that Z.D.'s trial testimony and prior statements conflict with each other (and conflict with other evidence), that Z.D.'s ability to perceive events was

29

impaired at all relevant times, and that there is no forensic evidence to support the charges against him.

In response, the State argues that Defendant is focusing on minute details in Z.D.'s CAC interview even though the core substance of her account—digital and penile penetration—is consistent with her trial testimony. We agree.

Despite inconsistencies in Z.D.'s testimony, she never faltered regarding the fact that Defendant digitally penetrated her vagina on multiple occasions and penetrated her vagina with his penis on one occasion. Moreover, Z.D.'s testimony in this respect was corroborated by her CAC interview, Chloe's testimony regarding Z.D.'s disclosure, and Defendant's confession to Chloe.

In addition, Z.D. testified at trial that she was not setting out the accounts in order, but "those are the times that I remember." She then stated, "I don't remember it in order." And during cross-examination, she stated that she did not believe her memory was better at the time of her CAC interview. She explained, "The whole time -- I tried to forget what happened." "I'm reliving everything right now, so, a lot more memories is [sic] coming up."

This court has recognized that in sexual abuse cases which continue over time, exact dates often cannot be supplied, and the dates of the offenses are not essential elements of the crimes. *See, e.g., State v. Dixon*, 628 So.2d 1295 (La.App. 3 Cir.1993).

As to any omissions in her CAC interview, Z.D. explained on redirect that when she appeared for her interview, she did not know what to expect and answered the questions to the best of her ability. She was not given any guidance or direction on what she was supposed to share.

And as to the lack of physical evidence, the State suggests that Defendant ignores Z.D.'s testimony that she "got a wet rag and wiped everything off."

Importantly, "Louisiana jurisprudence has consistently held that the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even if there is no physical evidence." *State v. Ware*, 11-337, p. 4 (La.App. 3 Cir. 11/23/11), 80 So.3d 593, 597, *writ denied*, 11-1391 (La. 3/9/12), 84 So.3d 549, *and writ denied*, 12-46 (La. 8/22/12), 97 So.3d 358.

In addition, the impeachment of the victim of a sex offense was addressed in *State v. Hypolite*, 13-1365 (La.App. 3 Cir. 5/14/14), 139 So.3d 687, *writ denied*, 14-1242 (La. 1/23/15), 159 So.3d 1056. There, this court explained:

> In this case, the jury heard the victim testify that Defendant "tried to stick his private in . . . [her] vagina." When he did so, the victim jumped and tried to close her legs. The victim also testified that some of Defendant's penis went in but not the whole thing. The jury also heard Dr. Burnell's testimony that the victim said Defendant did not penetrate her and heard the Stuller Place interview where the victim specifically answered "no" when asked if Defendant put his private part in her private part. At trial, the victim explained that she told the Stuller Place interviewer and the doctor that Defendant did not penetrate her because she did not understand the meaning of penetration at that time. At the time the victim spoke to the interviewer and the doctor, she was ten years old and believed that "penetration" meant that Defendant's penis went all the way into her vagina. Thus, when the victim told the interviewer and the doctor that Defendant did not penetrate her, she meant that Defendant's whole penis was not inserted into her vagina. We note that the Stuller Place interviewer did not use the word "penetrate." Thus, the victim's trial explanation as to her misunderstanding of the word "penetrate" did not explain why she told the Stuller Place interviewer "no" when asked if Defendant put his private part into her private part.

> As this court explained in *State v. Bender*, 598 So.2d 629, 636 (La.App. 3 Cir.), *writ denied*, 605 So.2d 1125 (La.1992):

> > When a witness is impeached, this simply means the jury, as the trier of fact, was presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury was prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.

31

At trial, the victim clearly testified that Defendant stuck a portion of his penis into her vagina. The jury was able to weigh this testimony against the victim's inconsistent pre-trial statements and her explanation for the inconsistencies. Obviously, the jury chose to believe the victim's trial testimony.

. . . .

. . . Furthermore, the jury obviously chose to believe the victim's trial testimony regarding penetration and her explanation as to why she previously said that no penetration occurred. Thus, the evidence was sufficient to find Defendant guilty of aggravated rape.

*Id*. at 696–98 (alteration in original).

Likewise, in *State v. Schexnaider*, 03-144 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, the defendant argued there was insufficient evidence to convict him due to irreconcilable inconsistencies in the victim's testimony. Yet this court concluded:

The inconsistencies pointed out by the Defendant do not concern the actual act of forcible rape. There are no contradictions in E.N.'s testimony regarding the actual act of forced intercourse with the Defendant. The trial court considered the testimony of all witnesses in this case and made a credibility determination that should not be second guessed by this court. Furthermore, "[t]he fact that the record contains evidence which conflicts with the testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient." *State v. Holley*, 01-0254, p. 6 (La.App. 3 Cir. 10/3/01), 799 So.2d 578, 583, *citing State v. Tompkins*, 403 So.2d 644 (La.1981), *appeal after remand*, 429 So.2d 1385 (La.1982).

*Id*. at 456–57.

In the end, the jury made a credibility determination in this case. There is no evidence that Z.D.'s capacity to perceive, remember, and retell events had been impaired. As the finder of fact, the jury was entitled to reject or accept Z.D.'s testimony, and after deliberating and weighing the evidence, the jury found Defendant guilty of the above sex offenses. While there may have been some inconsistencies in Z.D.'s interview, the jury chose to believe her testimony—along with other evidence, such as Defendant's confession to Chloe—that Defendant

committed these sex offenses, and this court will not second guess those credibility determinations.

Based on the foregoing, we conclude that a rational trier of fact could have found proof beyond a reasonable doubt that Defendant was guilty of two counts of aggravated crime against nature and one count of attempted aggravated crime against nature. Again, it was the jury's prerogative to assess the credibility of the witnesses and to accept or reject their testimony. We will not second guess the jury's credibility determinations nor will we impinge on its role as factfinder. Accordingly, Defendant's convictions are affirmed.

## III. Defendant's Second Assignment of Error

In his second assignment of error, Defendant contends he was denied due process of law when he was tried by a six-person jury for crimes with the potential aggregate sentence of sixty years at hard labor and lifetime sex offender registration.

According to Defendant, an objection to the composition of the jury was made prior to voir dire. Thereafter, Defendant filed a motion for new trial. That motion is governed by La.Code Crim.P. art. 851, which states in part:

> A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
>
> B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
>
> . . . .
>
> (5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

Defendant argued in his motion for new trial that conviction of a serious offense by a six-person jury violated his constitutional rights and did not serve the ends of justice. He questioned the "constitutionality of this procedural custom" and

33

suggested the applicable sentencing provision resulted in a procedural injustice. The applicable sentencing provision for aggravated crime against nature is found in La.R.S. 14:89.1(C)(1), which provides for imprisonment, "with or without hard labor, for a term not less than five years nor more than twenty years, or both." But that provision must be read in conjunction with La.Code Crim.P. art. 782(A) (emphasis added), which states in relevant part:

> A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment *may* be confinement at hard labor *shall* be tried by a jury composed of six jurors, all of whom must concur to render a verdict.

Defendant went on to suggest that *Ramos v. Louisiana*, 590 U.S. ___, 140 S.Ct. 1390 (2020), was relevant to not only the unanimity of jury verdicts but also the numerical composition of the jury as well. There, the Supreme Court explained that "no person could be found guilty of a serious crime unless 'the truth of every accusation . . . should . . . be confirmed by the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen, and superior to all suspicion.'" *Id*. at 1395 (quoting 4 W. Blackstone, *Commentaries on the Laws of England* 343 (1769).

In contrast, the State opposed the motion, arguing that because of the word "may" in Code Crim.P. art 782(A), Defendant was prevented from being tried by a jury of twelve.

The hearing on the motion was held in July 2023. At the hearing, defense counsel discussed the sentencing provision for aggravated crime against nature:

> [T]he law is clear and the statute is clear. It's a six-person jury, but the bottom line is we feel like that's unconstitutional considering the severity of the penalty that he's facing because he's facing not less than five nor more than twenty-five years per count without the benefit of probation, parole, or suspension of sentence and he's facing a lifetime sex offender registration, and I certainly don't know every statute in the Code, but I know certainly I've never seen one with the penalty this severe where someone is not entitled to a twelve-person jury . . . . The

34

statute is just very, very peculiar. The statute reads, A fine of not more than $50,000 or imprisonment of five to twenty years with or without hard labor or both.

Defense counsel then asked the trial court to "determine that this statute as written is unconstitutional" and grant Defendant a new trial before a jury of twelve due to the nature of the offense. Defense counsel also stated he felt like Defendant's constitutional rights were violated. Later in the hearing, counsel stated:

> So, judge, that's another example of what I mean when I point out the reality of this particular statute, and certainly can't speak to the legislature, but I certainly believe that it's quite possible that this statute as written was a mistake in order to make it with or without hard labor and that's what makes it a six-person jury because it's with or without hard labor. If it was clearly hard labor then, of course, he would be entitled to a twelve-person jury, but I think it's very, very possible that the legislature intended for it to be a twelve-person jury, but they inadvertently wrote it so that it's a six-person jury.

Then, in rebuttal, defense counsel acknowledged that the law, as written, required a six-person jury:

> I think the law as stated mandated a six-person jury, but I think the law as stated is unconstitutional considering the severity of the crime that he's facing. I think the statute is clear. It says with or without hard labor. So, the law is clear that that's a relative felony and the law is clear in Louisiana when you're facing a relative felony you only get a six-person jury. So, I'm not disputing the law. Our point, judge, is based on what he's facing that law is unconstitutional, that he should get a twelve-person jury based on the severity of what he's facing, especially considering the additional penalty of lifetime registration as a sex offender.

The trial court ultimately denied the motion for new trial, noting that the applicable legislation was clear, that *Ramos* was limited to twelve-person juries, and that juries of six had required unanimity for as long as the judge could remember.

In his sentencing memorandum, Defendant stated there were many issues with La.R.S. 14:89.1(C)(1), specifically the fact that a serious offense called for a jury of six. And in his brief to this court, Defendant contends that trial by a jury of six violated his constitutional right to due process. Defendant suggests on appeal that

35

the constitutionality of La.Code Crim.P. art. 782 was raised in his motion for new trial. Defendant argues that Article 782 is unconstitutional under *Ramos* because it continues to provide for nonunanimous verdicts. Defendant concludes by cautioning this court not to wait for the United States Supreme Court to find La.Code Crim.P. art. 782 unconstitutional. He asks us to find that the trial court erred in denying his pre-trial objection as to jury number, his objections in his sentencing memorandum, and his motion for new trial.

On the other hand, the State contends that a trial error cannot be raised for the first time in a motion for new trial, citing *State v. Batiste*, 318 So.2d 27 (La.1975). The State avers that constitutionality must be raised in a motion to quash or motion in arrest of judgment per *State v. Picchini*, 463 So.2d 714 (La.App. 4 Cir.), *writ denied*, 468 So.2d 1202 (La.1985), and raising a constitutional challenge in a memorandum is insufficient. Therefore, failure to comply with the proper procedural method precludes raising the issue of constitutionality. The State then notes that there is nothing in the record indicating that Defendant objected to the number of jurors prior to voir dire. And finally, the State suggests that a motion for new trial and sentencing memorandum are improper and untimely methods of challenging the constitutionality of La.Code Crim.P. art. 782(A).

Rule 2–12.4(A)(9)(c) of the Uniform Rules of Louisiana Courts of Appeal provides that for "each assignment of error and issue for review which required an objection or proffer to preserve, a statement that the objection or proffer was made, with reference to the specific page numbers of the record[.]" Defendant cites record page 320 in support of his assertion that an objection to the number of jurors was made prior to voir dire. Yet there is no objection on page 320 of the record or that of the supplemental record. Moreover, the statement in Defendant's sentencing memorandum did not preserve the issues presented to this court because the

memorandum did not require a ruling by the trial court. *State v. Bivens*, 11-156 (La.App. 3 Cir. 10/5/11), 74 So.3d 782, *writ denied*, 11-2494 (La. 3/30/12), 85 So.3d 115.

Additionally, in the motion for new trial and at the subsequent contradictory hearing, Defendant did not specifically allege that trial by a jury of six violated his right to due process. In other words, this issue was not first presented to the trial court for consideration, meaning that it is not properly before this court. Uniform Rules—Courts of Appeal, Rule 1–3.

So it comes down to this: Did Defendant properly raise a constitutional challenge to La.Code Crim.P. art. 782? "Louisiana jurisprudence requires that the constitutionality of a statute be specially pleaded in a petition, exception, written motion, or answer and that the grounds be particularized, so that the parties are given sufficient time to brief and prepare arguments regarding their position on a constitutional question." *State v. Schoening*, 00-903, p. 4 (La. 10/17/00), 770 So.2d 762, 765.

In *State v. Granger*, 07-2285 (La. 5/21/08), 982 So.2d 779, 784 n.5, the supreme court found that a constitutional challenge presented in a "Motion to Reconsider Ruling," which was filed after the trial court dismissed the defendant's motion to expunge, was properly before the court. Thus, a constitutional challenge need not be raised in a motion to quash or motion in arrest of judgment. However, "Raising a constitutional challenge and particularizing the grounds in a memorandum is insufficient." *State v. Hatton*, 07-2377, p. 19 (La. 7/1/08), 985 So.2d 709, 721–22.

In his motion for new trial, Defendant referenced La.R.S. 14:89.1 and La.Code Crim.P. art. 782 and claimed his constitutional rights were violated. And at the hearing on his motion, defense counsel argued: "that's unconstitutional," "this

37

statute . . . is unconstitutional," and "the law is unconstitutional." Yet it is unclear whether he was challenging La.R.S. 14:89.1 or La.Code Crim.P. art. 782, or both, because defense counsel did not specifically cite either source of law during the hearing. Based on our review of the record, the constitutionality of La.Code Crim.P. art. 782 was not raised by motion nor was it specifically pled. Thus, the constitutionality of that article is not properly before this court.

For the above reasons, Defendant's second assignment or error is without merit.

## IV.   Defendant's Third Assignment of Error

In his third assignment, Defendant contends that the trial court violated his Fifth Amendment rights by allowing the State, over his objection, to comment on the exercise of his right to remain silent. Defendant specifically points to the State's direct examination of Detective Sergeant Jones:

Q.   Did you make any attempt to contact the Defendant at this point?

A.   At that exact point, no, ma'am, not right after the CAC. It was about a week later.

. . . .

Q.   And what was the response?

A.   He said he was not willing to provide a statement at that time, and I would need to speak with his attorney.

Detective Seargent Jones was later asked:

Q.   After you interviewed James, what did you do next in your investigation?

A.   So, that was the Tuesday after Memorial Day, [Defendant] did not want to give a statement. I talk to --

[DEFENSE COUNSEL]:

Judge, I'm gonna object. He's got a [F]ifth [A]mendment right not to give a statement. This is the second time he's alluded to my client exercising his Fifth Amendment right. I let it slide the first time,

Judge, but I'm not going to let him repeatedly tell this jury this man refused to give a statement, because he's got a constitutional right not to give a statement.

THE COURT:

I understand what you're saying, but from a factual standpoint, it [is] evidence that he can testify to, and I don't have a problem with giving the same admonishment that I gave before. He does have a Fifth Amendment right not to say anything if he so desires for whatever reason, but if he requested it and didn't, you are entitled to know that and look at it for whatever purpose it may have led throughout the investigation.

[DEFENSE COUNSEL]:

Judge, just note my objection because if he exercises his Fifth Amendment right, there [is] nothing they can take from that, that is permissible. Would you agree with that?

THE COURT:

Against your client -- except for maybe the next step in his investigation as I felt -- was where we were going.

[DEFENSE COUNSEL]:

Okay. But nothing they can take against my client.

THE COURT:

Correct. You cannot hold it against [Defendant].

Defendant then cites several cases, including *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240 (1976). There, the Supreme Court held that a criminal defendant's silence in response to Miranda warnings cannot be used for impeachment during cross-examination.[3] Defendant also relies on *State v. Montoya*, 340 So.2d 557 (La.1976). In that case, the Louisiana Supreme Court concluded that references during trial to

---

[3] Defendant also cites *State v. Smith*, 336 So.2d 867 (La.1976); *State v. Mosely*, 390 So.2d 1302 (La.1980); *State v. Kersey*, 406 So.2d 555 (La.1981); *State v. George*, 95-110 (La. 10/16/95), 661 So.2d 975; *State v. Campbell*, 97-369 (La.App. 5 Cir. 11/25/97), 703 So.2d 1358; *State v. Olivieri*, 03-563 (La.App. 5 Cir. 10/28/03), 860 So.2d 207; and *State v. Pierce*, 11-320 (La.App. 5 Cir. 12/29/11), 80 So.3d 1267. These cases discuss a defendant's silence at the time of his arrest or thereafter.

the defendant's post-arrest, post-Miranda silence was reversible error even when the defendant did not take the stand.

Defendant contends that the State improperly commented on Defendant's exercise of his right to remain silent during its opening statement and closing argument and that the State intentionally led Detective Sergeant Jones to reiterate this fact. Defendant suggests that the State had no purpose for doing so other than to encourage the jurors to ascribe a guilty meaning to his silence. Defendant further contends that under La.Code Crim.P. art. 771, the trial court's admonishment to the jury misstated the law and was not an adequate remedy.[4] Hence, Defendant concludes that the convictions in this case must be reversed.

In response, the State notes that defense counsel did not object when Detective Sergeant Jones testified that Defendant informed him that he (Defendant) would need to speak to his attorney. Thus, any claim of prejudice was waived. But even if an objection had been made, the question was not used to impeach Defendant, and the State did not inquire about Defendant's failure to respond to police questioning.

As to Detective Sergeant Jones's subsequent testimony that Defendant did not want to give a statement, the State suggests that the testimony was nonresponsive and not chargeable to the State. Further, an admonishment was requested and was given, and that admonishment was clear. Moreover, Defendant fails to provide a record reference for his claims that the State commented on Defendant's silence in its opening statement and closing argument.

Detective Sergeant Jones testified that Defendant's father reached out to police during the Memorial Day weekend to determine if Defendant was going to be

---

[4] Under La.Code Crim.P. art. 771, the trial court has the discretion to grant a mistrial or simply admonish the jury, upon the request of the defendant, where reference to a defendant's post-arrest silence is made. In cases where the trial court is satisfied that an admonition is not sufficient, upon motion of the defendant, the trial court may grant a mistrial.

arrested. Detective Sergeant Jones further specified that he spoke to Defendant on the telephone about a week after Z.D.'s May 21, 2019 CAC interview. There was no testimony regarding the Mirandization of Defendant at the time of Detective Sergeant Jones's telephone conversation with him. Furthermore, Defendant was not arrested until February 21, 2020. Based on the approximate date of the phone conversation and Defendant's date of arrest, there was no comment by Detective Sergeant Jones regarding Defendant's post-Miranda or post-arrest silence, and Defendant makes no argument regarding his pre-arrest, pre-Miranda silence.

In summary, Defendant did not move for mistrial and did not request an admonishment under La.Code Crim.P. art. 771. Because of this, we need not reach the issue of whether the trial court's comments following denial of defense counsel's objections were improper. In addition, Defendant's brief does not set out a page reference to an objection during opening statements or closing statements, as required by Rule 2–12.4(A)(9)(c) of the Uniform Rules of Louisiana Courts of Appeal, and we found none. For these reasons, Defendant's third assignment lacks merit.

## V. Defendant's Fourth Assignment of Error

In his final assignment of error, Defendant contends that the trial court abused its discretion in imposing twelve-year and six-year sentences on a first offender.

The penalty for Defendant's offense of aggravated crime against nature is a fine not exceeding fifty thousand dollars, or imprisonment, with or without hard labor, for not less than five years nor more than twenty years, or both. La.R.S. 14:89.1(C)(1). For attempted aggravated crime against nature, it is half of the sentence given in La.R.S. 14:89.1(C)(1) (two and a half to ten years). La.R.S. 14:89.1; La.R.S. 14:27. Thus, of the possible maximum sentence of fifty years, Defendant received eighteen years at hard labor—that is, twelve years for each count

41

of aggravated crime against nature, six years for the count of attempted aggravated crime against nature, and all set to run concurrently.

The standard of review for excessive-sentence claims was addressed in *State v. Barling*, 00-1241, 00-1591 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331. There, this court explained:

> La. Const. art. 1, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

*Id*. at 1042 (citations omitted).

In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, we further explained:

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

Louisiana Code of Criminal Procedure Article 881.4(D) states that "[t]he appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed." To this end, La.Code Crim.P. art. 894.1 enumerates aggravating and mitigating factors to be considered by the trial court in imposing a

sentence. In relevant part, it provides that the trial court "shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence." La.Code Crim.P. art. 894.1(C). "While the trial judge need not articulate every aggravating and mitigating circumstance outlined in [La.Code Crim.P.] art. 894.1, the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983).

Here, Defendant argues that the trial court failed to adequately consider the aggravating and mitigating factors of La.Code Crim. P. art. 894.1. He claims that the vast majority of the eleven mitigating factors apply to him, highlighting the following: he had no history of prior delinquency or criminal activity and had led a law-abiding life for a substantial period of time before committing his crime; his criminal conduct was the result of circumstances unlikely to recur; his imprisonment would entail excessive hardship to himself or his dependents; and he did not use any firearms or drugs while committing the crime. Defendant also claims that the evidence presented during sentencing shows that his passive nature and slight build will likely invite the other inmates to victimize him.

Defendant points out that he has no prior convictions. He claims that the aggravating factors cited by the trial court do not apply or were already considered in the statute. For example, the first three factors—undue risk of harm, need of correctional treatment, and deprecate seriousness of the crime—are factors intended to determine incarceration versus probation, not the term of the sentence. Defendant contends that the minimum sentence, or one in the lower-mid range, would have been constitutional in this case.

In further support of a lower sentence, Defendant notes that the investigation of this case ended in June 2019, yet he was not arrested until February 2020. Based

on this, Defendant infers that law enforcement was not urgently concerned to get him off the street. Defendant also notes that he turned himself in and was then released on bond for three years without incident. And based on this, he suggests there was no factual basis for finding that he was an undue risk to society or in need of incarceration.

However, based on our review of the record, we disagree with Defendant's claim that the trial court did not adequately consider the mitigation factors of La.Code Crim. P. art. 894.1. The following is taken from the transcript of Defendant's sentencing hearing:

THE COURT:

This is a sad situation, mainly the destruction of a family and the occurrences that have been established by a jury. This is not anything where anyone will win so to speak . . . but the legislature has seen fit to give the Court guidelines with regard to sentencing. They're referenced under Article 894.1 of the Code of Criminal Procedure.

Initially, if the defendant has been convicted of a felony the Court should impose a sentence of imprisonment if any of the following occur:

Is there an undue risk that during a period of a suspended sentence or probation the defendant would commit another offense . . . . The legislature has seen fit to put in place minimum mandatories to establish the seriousness of the offense, as well as the need to protect individuals. So, we would answer that in the affirmative.

The defendant is in need of correctional treatment or custodial environment that can be provided most effectively by his commitment to an institution . . . .

Would a lesser sentence other than incarceration deprecate the seriousness of the defendant's crime? Obviously, we have a sex offense, a crime of violence involving a young female family member as the victim and someone that they looked up [to] for support as the perpetrator. The court answers that in the affirmative.

In determining the degree of incarceration the Court looks under the aggravating and mitigating circumstances to make that determination. Some of those were mentioned by defense counsel. Generally, I go through it and address only the ones I think do have application[] and the reasons why.

First of all, the offender's conduct during the commission of this offense would have manifested deliberate cruelty to the victim. The testimony has established the struggles the victim has gone through as a result. They have been corroborated by other witnesses and at least by the statement as to why the individual is not here today, the actual victim, and the difficulties she had going through this trial.

Two, the offender knew or should have known that the victim was particularly vulnerable or incapable of resistance due to extreme youth. Whether the youth is extreme, he was a family member. There was a situation of trust as well as reliance of which the offender knew of both the strengths and weaknesses of the victim and took advantage of those based on the testimony that was provided at trial.

The offender used his position or status to help facilitate the commission as the victim's uncle. As previously mentioned, knew intimately or more so probably inappropriate use of terms, but knew in specific details the status of the victim, what could and could not potentially be successful and use that information and her position and his status to facilitate.

Where it says the offender used threats or actual violence in the commission, by its nature designated as a crime of violence, would have to consider that actual violence involved.

. . . .

The offense has resulted in a significant permanent injury and a significant economic loss to the victim or family. Obviously, this family has been fragmented. There is still a lot of anger. There still is a lot of pain. That has not been resolved and doubt that it ever will be in its entirety. I have a young 20-year old that has now been traumatized.

. . . .

The offense the Court would find to be – could be a major economic offense. It's apparent that she needs counseling, she needs assistance, and she's going to have people that she can rely on and trust and hopefully return that trust to her in an appropriate, positive manner as she goes through things. She will probably have difficulty in maintaining employment, maintaining relationships. The Court has seen a number of these cases and the things that basically trickle down as a result throughout those individual's lives for long-term.

Other aggravating circumstances. While the Court does not take anything away from the defendant's position that he's innocent of these, the Court heard the testimony, the Court has heard the jury, the decision has been made. At no point have I heard anything to be repentant in any way fashion. While that is clearly within his right, I do find that to be somewhat considered.

45

Under mitigating circumstances I do agree with defense counsel on many of those. The defendant has no history, no prior delinquency, criminal activity, basically lead a law-abiding life, at least on a record, before the commission of these offenses.

The defendant's criminal conduct is the result of circumstances unlikely to reoccur. It's noted that the defendant himself is I think 29 years of age at this time whether there have been or will be other victims is something that has never been established. I can't say that is mitigating, otherwise the State would not require the extensive notification for life that he will be in order to monitor and make certain that does not occur . . . .

. . . .

Would the imprisonment hold or impose or entail excessive hardship? Obviously, the Court has heard and seen a number of occasions where the father has relied on him for health care and treatment and support at the household. I understand the argument defense counsel makes about DOC time and him not being a candidate for that. One of the most difficult things the Court sees on a regular basis are young individuals with no history having to go way to incarceration . . . .

Thus, before imposing Defendant's sentences, the trial court gave ample consideration to the facts and circumstances of Defendant's case, including those highlighted by Defendant on appeal.

As to the nature of the offenses, Z.D. (Defendant's niece) testified in detail about the numerous times she was sexually abused by Defendant. He raped her; he sexually battered her. These are heinous offenses.

Turning now to Defendant's history and circumstances. Before these events made him a felon at the age of twenty-nine, Defendant went to Barbe High School, graduated from Parkview Christian School in 2013, attended McNeese State University for a few semesters before transferring to SOWELA Tech to pursue a dual degree in computer networking and processing. He was to graduate in May of 2023, but his trial prevented that.

Defendant had many friends and family members who wrote letters expressing their care and concern for his well-being, including his father, Jim. Jim had been in intensive care, and Defendant would take care of him when he was not in school.

Finally, in comparing the circumstances here to similar cases, the trial court could have made Defendant's sentences consecutively without abusing its discretion. For instance, in *State v. Lemay*, 23-369, (La.App. 3 Cir. 12/20/23) (unpublished opinion) (2023 WL 8797499), the defendant committed sex acts against his seven-year-old stepdaughter over a two-month period. He was convicted of two counts of aggravated crime against nature. The trial court then imposed two consecutive terms of thirteen and fifteen years at hard labor but suspended the second sentence. The defendant was a first felony offender, a father of three, and a grandfather. He had good employment history, military experience, and a host of family and friends who spoke on his behalf. This court affirmed that sentence.

Similarly, in *State v. Faciane*, 19-702 (La.App. 3 Cir. 3/18/20), 297 So.3d 823, 825, 831, the defendant was convicted of five counts of aggravated crime against nature. He committed the offenses against his stepdaughter, who was no more than fourteen years old when the offenses began. These events occurred over a period of three years. The trial court imposed five concurrent sentences of fifteen years at hard labor, just five years short of the maximum twenty. On appeal, the defendant claimed that the trial court had imposed his sentence "without any apparent consideration of La.Code of Criminal Procedure Art. 894.1." *Id*. at 832. Yet this court affirmed that sentence: "The sentence imposed was significantly less than the total maximum exposure[.]" *Id*. at 834. This court further explained:

> [I]f the trial court had ordered Defendant's sentences to run consecutively, the term of imprisonment would have totaled seventy-five years. Thus, Defendant received a substantial benefit from the trial

47

court's imposition of concurrent sentences as there is jurisprudence supporting the imposition of consecutive sentences in similar cases. *See State v. H.B.*, 06-1436, p. 7 (La.App. 3 Cir. 4/4/07), 955 So.2d 255, 260, where this court stated, "Review of the jurisprudence shows that different victims, places, or dates mean different transactions and different schemes or plans."

*Id*.

Finally, in *State v. Roy*, 15-516, pp. 11–12 (La.App. 3 Cir. 11/4/15), 177 So.3d 1112, 1119, this court affirmed the imposition of consecutive sentences, explaining as follows:

> In *State v. Thibodeaux*, 05-1187 (La.App. 3 Cir. 3/1/06), 924 So.2d 1205, *writ denied*, 06-700 (La. 10/6/06), 938 So.2d 65, this court upheld three ten-year-consecutive sentences after Thibodeaux pled guilty to three counts of molestation of a juvenile. The offenses in *Thibodeaux* were not based on the same act or transaction and occurred over a five-year period for one victim and over a six-month period for the other two victims. *Id*. at 1214. This court further noted that Thibodeaux's acts reflected a propensity to prey on those unable to protect themselves, particularly the mentally handicapped victim. *Id*. The record contained evidence of threats of violence and actual acts of violence by Thibodeaux as well as evidence that Thibodeaux sought to purchase a firearm while out on bond. *Id*.
>
> In *State v. Mickens*, 31,737 (La.App. 2 Cir. 3/31/99), 731 So.2d 463, *writ denied*, 99-1078 (La. 9/24/99), 747 So.2d 1118, the second circuit upheld consecutive sentences for one count of molestation of a juvenile and one count of indecent behavior with a juvenile (both offenses committed against the same victim). Mickens was sentenced to ten years for molestation of a juvenile and seven years for indecent behavior with a juvenile. In particular, the second circuit noted that Mickens was in a common-law relationship with the victim's mother and violated his paternal role in the commission of the crimes. *Id*. at 472. Additionally, the second circuit noted that consecutive sentences are not uncommon in cases involving acts of molestation over an extended period of time by persons in the same household as the victim. *Id*. at 473.
>
> Considering the above statutory and jurisprudential authority, we find the trial court did not abuse its discretion in imposing the minimum sentences, albeit consecutively. Defendant's assignment of error lacks merit.

Very simply, "sentence review under the Louisiana constitution," as cautioned by the supreme court, "does not provide an appellate court with a vehicle for

substituting its judgment for that of a trial judge as to what punishment is more appropriate in a given case." *State v. Savoy*, 11-1174, p. 5 (La. 7/2/12), 93 So.3d 1279, 1283.

Here, Defendant's sentence of twelve years and six years running concurrently is not constitutionally excessive. And the trial court did not abuse its discretion in sentencing Defendant.

## DISPOSITION

Defendant's convictions and sentences are affirmed. Nevertheless, within thirty days of this judgment, the trial court shall comply with La.Code Crim.P. art. 930.8 by sending Defendant written notice of the prescriptive period for filing post-conviction relief and by filing written proof in the record that Defendant received this notice.

**CONVICTIONS AND SENTENCES AFFIRMED.**